<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KATHLEEN JENNINGS and PATRICK JENNINGS, Husband and Wife,** | |
| Plaintiffs, | Civil Action No. 13-4390 (ES) (MAH) |
| v. | OPINION |
| **J.C. PENNEY CORP., INC. et al.,** | |
| Defendants. | |

**SALAS, DISTRICT JUDGE**

**I.      Introduction**

This action arises from a fall sustained by Plaintiff Kathleen Jennings ("Plaintiff") while shopping at the Woodbridge, New Jersey store of Defendant J.C. Penney Corporation, Inc. ("J.C. Penney" or "Defendant").  Pending before the Court is J.C. Penney's Motion for Summary Judgment.  (D.E. No. 15).  The Court has considered the submissions accompanying the instant motion and decides the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b).  For the reasons set forth below, Defendants' motion is GRANTED and Plaintiff's complaint is dismissed in its entirety.

**II.     Background[1]**

Plaintiffs allege that the J.C. Penney premises in the Woodbridge Center Mall were unsafe and that, as a result, Plaintiff fell. (Def. SMF ¶ 2). At her deposition, Plaintiff stated that she was familiar with the particular J.C. Penney store; she went there at least once a week for many years since she grew up in the area. (*Id.* ¶¶ 4, 6).

On the date of the incident, Plaintiff went shopping at J.C. Penney with her mother, older son, and one-year old child. (*Id.* ¶ 7). The one-year old was just learning to walk. (*Id.* ¶ 8). Plaintiff was wearing shorts and "flip-flops." (*Id.* ¶ 9). Plaintiff was walking down the floor aisle and was holding her one-year old's hand in her right hand. (*Id.* ¶¶ 10, 11). She turned to the right and took a skirt on a hanger off the rack with her left hand. (*Id.* ¶ 12). The skirt rack was on the right-hand side of the aisle. (*Id.* ¶ 13). Plaintiff did not step off the aisle on to the carpeted area. (*Id.* ¶ 14). She turned to her left and took three steps towards her mother to show her the skirt, which her mother did not like. (*Id.* ¶¶ 15, 16). Plaintiff testified that she "went to turn around to put [the skirt] back and [she] felt something under [her] foot and [she] fell back." (*Id.* ¶ 16). Plaintiff's mother helped her get up right away. (*Id.* ¶ 17). Plaintiff further testified as follows:

> Q: Did you look around you to see what had caused you to fall?
> A: Yes.
> Q: What did you see?
> A: We didn't see anything. My mom looked around and everything.

---

[1] These background facts are taken from the parties' statements of facts under Local Civil Rule 56.1. (D.E. No. 15-3, Statement of Material Undisputed Facts Pursuant to L.Civ.R. 56.1 by J.C. Penney ("Def. SMF"); D.E. No. 16-2, Counter Statement of Material and Disputed Facts Pursuant to Local Civil R. 56.1 by Plaintiffs ("Pl. CSMF"); D.E. No. 20-1, Response of Defendant J.C. Penney to Plaintiffs' Counterstatement of Material and Disputed Facts ("Def. CSMF")). The Court notes that Plaintiff admitted Defendant's undisputed facts in their entirety, (Pl. CSMF ¶ 1), and that Defendant disputes certain portions of Plaintiffs' Counterstatement, (*see, e.g.*, Def. CSMF ¶¶ 3, 8–12, 20). The Court will "disregard all factual and legal arguments, opinions and any other portions of the 56.1 Statement which extend beyond statements of facts." *Globespanvirata, Inc. v. Tex. Instrument, Inc.*, 2005 U.S. Dist. LEXIS 27820, at *10 (D.N.J. Nov. 10, 2005); *see also* L. Civ. +R. 56.1 ("Each statement of material facts . . . shall not contain legal argument or conclusions of law.").

> Q: Your mom looked around, as well?
> A: Yes.

(*Id.* ¶ 18).

Plaintiff testified that, after she fell, she, her mother, and sons waited about ten minutes for someone to come over to them. (*Id.* ¶ 19). An associate came over to them and said she would go and find someone to help them. Plaintiff testified that they stood at the location for another ten minutes and then walked over to the customer service. (*Id.* ¶ 20). Plaintiff gave a report of the incident to a J.C. Penney employee, Raymond Brigantino, while standing approximately five to ten feet away from the location where she fell. (*Id.* ¶ 21). Plaintiff testified as follows:

> Q: And did you give him a description of your fall?
> A: Yes.
> Q: And did he ask you what you fell on?
> A: I told him that it was something under my foot. I said I really couldn't explain what it was. I felt something under my flip-flop, and I fell back. He said, okay, that's all I needed.
> Q: There was something under your flip-flop that you believe caused you to fall. Is that accurate?
> A: Yes.
> Q: You said that you looked around and didn't see anything. Is that accurate?
> A: Yes. We looked for it but couldn't find anything.
> Q: Did you look on your flip-flop?
> A: Yes.
> Q: Was your flip-flop wet?
> A: No.
> Q: Was there any sort of substance on your flip-flop?
> A: No.
> Q: What do you believe caused you to fall?
> A: I believe that it was one of the—like the tags or it could have been a bottle cap, maybe somebody left a bottle cap on the floor. I really don't know.
> Q: But you, yourself, did not find a tag or a bottle cap . . .
> A: No, I didn't. No.

(*Id.* ¶¶ 22, 23).  Plaintiff's mother testified that she did not know what caused Plaintiff to fall, that she did not see anyone drop anything on the floor, and she did not see any water on the floor. (*Id.* ¶¶ 5, 24, 25).

Plaintiff served J.C. Penney with a notice of deposition, seeking "[r]epresentative(s) of [J.C. Penney] familiar with the events of May 28, 2011, and familiar with the security, maintenance and inspection procedures of [J.C. Penney]."  (Pl. CSMF ¶¶ 2, 3).  J.C. Penny provided Mr. John Canaras, a loss prevention manager, in response to Plaintiff's request.  (Def. CSMF ¶ 3).  Mr. Canaras testified that after a person on the loss prevention team ensures the well-being of a subject, namely a customer reporting an incident, the loss prevention officer "would be responsible for inspecting the area and getting any necessary information regarding the subject and completing" the incident report.  (Def. SMF ¶¶ 26, 27).  He further stated that the goal of a loss prevention investigation is "to identify what happened and why it happened."  (*Id.* ¶ 28).

Mr. Canaras also testified regarding the inspection of aisles.  He testified that he is not aware of any exact schedule or mandate for aisles to be inspected, and that inspection is random and there is no record or log kept.  (Pl. CSMF ¶¶ 13, 14; Def. CSMF ¶¶ 13, 14).  He testified that he personally walks the aisles for fifty percent of his time in the store.  (Def. SMF ¶ 29).  He estimated that he walks through the woman's department up to fifteen times a day and two to three times per hour on a typical Saturday afternoon.  (*Id.* ¶ 30).  The store manager, the supervisors, and the associates are all also on the sales floor for most of the day.  (*Id.* ¶ 32). There are ten to fifteen sales people working in the women's department on an average Saturday, and there are three or four loss prevention officers working at the Woodbridge Center Mall location.  (*Id.* ¶¶ 45, 46).  Loss prevention personnel spend approximately twenty percent of their

time on the sales floor and, while they are on the sales floor, one of their duties is to inspect and look out for hazards. (*Id.* ¶ 47). Mr. Canaras conducts "safety stand-up meetings" in the store, during which he educates associates on "picking up any objects that are on the floor . . . and also, to immediately address and type of spill, any type of liquid spill" in order keep the floor "clear." (*Id.* ¶¶ 33–35). Mr. Canaras estimated that the store in question is approximately 110,000 to 120,000 square feet. (Pl. CSMF ¶ 16; Def. CSMF ¶ 16). There is one main aisle that is made of tile in the women's department at the J.C. Penney store in the Woodbridge Center Mall. (Def. SMF ¶ 31).

Mr. Canaras also testified that he communicates to associates, including sales people, about how they are supposed to look out for hazards. He instructs them "that it's everyone's responsibility to look out [and] maintain a safe environment." (*Id.* ¶ 36). He testified he always tells associates "see it, fix it; if you see an issue, fix and [sic] issue. It's just part of the culture in the store." (*Id.* ¶ 37). In addition to associates, this instruction is directed to the store manager, the assistant store manager, and loss prevention personnel. (*Id.* ¶ 38).

Mr. Canaras testified that incident reports are to be completed shortly after the incident occurs, and that they are filled out and kept in the regular course of J.C. Penney's business. (*Id.* ¶¶ 39, 48). In the customer version section of the report, the loss prevention officer states "the information from the customer's point of view, their description of what happened." (*Id.* ¶ 42). The person filling out the form is also supposed to inspect the area and give his or her description of the area. (*Id.* ¶ 43). In the case at issue, the condition of the surface area is noted as clear and dry. (*Id.* ¶ 44). In addition, the incident report is faxed to the insurance company shortly after the incident occurs. (*Id.* ¶ 40). With regard to the report of the incident at issue, the fax line at

5

the top of the document states it was faxed at 17:34, in other words, 5:34 PM, while the incident is listed as occurring at 4:41 PM. (*Id.* ¶ 41).

Mr. Canaras also testified that the J.C. Penney store in question has recorded video surveillance that is monitored by the loss prevention team, some of which runs constantly the entire time the store is open. (Pl. CSMF ¶¶ 4–7; Def. CSMF ¶¶ 4–7). Mr. Canaras testified that "there was no video of the actual incident" and he further testified that he did not review the "recording" himself because generally, the person who fills out the incident report is the person who checks the video to see if the incident was recorded. (Def. CSMF ¶ 8). With respect to the incident report at issue, the parties dispute whether other individuals (including potential witnesses) were interviewed about the incident, and the cause of Plaintiff's fall. (*See* Pl. CSMF ¶¶ 9–11; Def. CSMF ¶¶ 9–11).

A six-count Complaint was filed in this matter on May 22, 2013, in the Superior Court of New Jersey, Middlesex County, on behalf of plaintiffs Kathleen Jennings and Patrick Jennings, her husband. (*See* D.E. No. 1-1, Ex. A, Complaint ("Compl.")). The first five counts allege injury to Kathleen Jennings as a result of the negligence of J.C. Penney and related "John Doe" defendants; the sixth count alleges loss of consortium on behalf of Patrick Jennings. (*Id.*). On July 19, 2013, the case was timely removed to this Court pursuant to 28 U.S.C. §§ 1441, 1446. (D.E. No. 1). The parties conducted limited discovery on liability only and by Order dated September 19, 2014, United States Magistrate Judge Michael A. Hammer directed J.C. Penney to file a motion for summary judgment no later than December 12, 2014.[2] (D.E. No. 13). J.C.

---

[2] On December 4, 2014, Plaintiff sent former J.C. Penney employee Raymond Brigantino—whom J.C. Penney admits has personal knowledge of the incident—a subpoena and notice of deposition to take place on December 15, 2014. (Pl. CSMF ¶ 3; Def. CSMF ¶ 3). However, by letter dated December 8, 2014, Mr. Brigantino's counsel advised Plaintiff's counsel that the December 15, 2014 deposition would need to be rescheduled due to Mr. Brigantino's inability to take time off of work, and further advised that Mr. Brigantino objected to being deposed after the December 12, 2014 filing date of J.C. Penney's motion for summary judgment. (D.E. No. 16-1, Affidavit of J. Stewart Grad, Esq. Ex. D). Also on December 8, 2014, defense counsel filed a letter with the Court,

6

Penney filed the instant Motion for Summary Judgment on December 12, 2014.  (*See* D.E. No. 15-4, Memorandum of Law in Support of the Motion by Defendant J.C. Penney Corporation, Inc. for Summary Judgment ("Def. Mov. Br.")).  Plaintiff submitted her opposition on December 22, 2014, (*see* D.E. No. 16, Brief in Opposition to Summary Judgment Motion ("Pl. Opp. Br")), and J.C. Penney filed a reply on January 13, 2015, (*see* D.E. No. 20, Memorandum of Law in Reply to Plaintiffs' Opposition to the Motion for Summary Judgment by Defendant J.C. Penney Corporation, Inc. ("Def. Reply Br.")).  The motion is now ripe for adjudication.

### III.     Legal Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and if, when viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to a judgment as a matter of law.  *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists for trial when a reasonable finder of fact could return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "To be material, a fact must have the potential to alter the outcome of the case." *DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 119 (3d Cir. 2012).

The moving party must first show that no genuine issue of material fact exists.  *Celotex Corp.*, 477 U.S. at 323.  If the movant meets this burden, the burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  *Id.* at 324. Although the Court must consider all facts and their reasonable inferences in the light most

---

specifically asking Judge Hammer to quash the subpoena of Mr. Brigantino until after the motion for summary judgment was decided. (D.E. No. 14). A review of the docket shows that no further action was taken with respect to Mr. Brigantino's deposition, either by the Court or by the parties. However, because the Court finds that J.C. Penney is entitled to summary judgment, the request to depose Mr. Brigantino is denied as moot.

favorable to the non-moving party, *see Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995), the non-moving party must offer specific facts that establish a genuine issue of material fact—not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings, or unsupported assertions, bare allegations, or speculation to defeat summary judgment. *See Celotex,* 477 U.S. at 324; *Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d Cir. 2003).

## IV.     Discussion

Defendant argues that Plaintiff cannot prove a *prima facie* case of negligence because there is no evidence in the record that J.C. Penney breached its duty of care to Plaintiff. Defendant first contends that the mere fact that Plaintiff fell is not evidence that there was a substance or object on the floor and there is no evidence in the record that a dangerous condition existed. (Def. Mov. Br. at 13–14). Additionally, Defendant argues that even if a dangerous condition existed, there is no evidence that J.C. Penney had knowledge of it. (*Id.* at 14–21).

Plaintiff argues that "there are disputed issues of fact as to whether [J.C.] Penney[] properly and regularly monitored, cleaned and swept the area where Jennings fell and thereby caused a dangerous condition." (Pl. Opp. Br. at 2). Plaintiff contends that she does not need to provide "first hand personal knowledge as to why she fell" and that the motion should be denied because "determination of material disputed facts depends primarily on credibility evaluations." (*Id.* at 3–6). In addition, Plaintiff argues that there is a genuine issue of material fact as to whether J.C. Penney intentionally destroyed evidence, which Plaintiff contends could result in an adverse inference against J.C. Penney. (*Id.* at 6–11).

Under New Jersey law,[3] there are four elements in an action for negligence, namely (1) a duty of care owed to plaintiff by defendant; (2) a breach of that duty by defendant; (3) proximate cause; and (4) actual damages. *Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 400 (2009). The plaintiff bears the burden of proving each of these elements. *Cashour v. Dover Parkade, LLC,* No. A-4241-11T2, 2013 WL 560914, at *3 (N.J. Super. Ct. App. Div. Feb. 15, 2013). "The mere showing of an incident causing the injury sued upon is not alone sufficient to authorize the finding of an incident of negligence. . . . An inference [of negligence] can be drawn only from proved facts and cannot be based upon a foundation of pure conjecture, speculation, surmise or guess." *Long v. Landy*, 35 N.J. 44, 54 (1961) (internal citation and quotation marks omitted).

"Business owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation." *Nisivoccia v. Glass Gardens, Inc.*, 175 N.J. 559, 563 (2003). "The duty of due care requires a business owner to discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe." *Id*. An injured plaintiff must prove that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident. *Brown v. Racquet Club of Bricktown*, 95 N.J. 280, 291 (1984). Constructive knowledge is "if the condition had existed for such a length of time that [the defendant] should have known of its presence." *Bozza v. Vornado, Inc.*, 42 N.J. 355, 359 (1964).

Here, summary judgment is warranted because there is no evidence in the record from which a reasonable finder of fact could return a verdict for Plaintiff.

---

[3] *Erie* provides that a federal court sitting in diversity must apply substantive state law and federal procedural law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The parties do not dispute that New Jersey substantive law applies here.

First, aside from Plaintiff's speculations, there is no evidence in the record that a dangerous condition existed. Plaintiff testified that she felt "something" under her flip-flop which caused her to fall—perhaps a tag or a bottle cap—but that "I really don't know." (Def. SMF ¶¶ 22, 23). In fact, the evidence in the record demonstrates that neither Plaintiff nor her mother could find any object or substance on the floor where Plaintiff slipped, there was nothing on Plaintiff's flip-flop after she fell, and the incident report indicates that the floor was clear and dry. (*Id.* ¶¶ 22–25, 44). As previously noted, however, "[t]he mere showing of an incident causing the injury sued upon is not alone sufficient to authorize the finding of an incident of negligence. . . . An inference [of negligence] can be drawn only from proved facts and cannot be based upon a foundation of pure conjecture, speculation, surmise or guess." *Long*, 35 N.J. at 54; *see also Petersen v. Twp. of Raritan*, 418 N.J. Super. 125, 132 (App. Div. 2011) ("'[U]nsubstantiated inferences and feelings' are not sufficient to support or defeat a motion for summary judgment.") (quoting *Oakley v. Wianecki*, 345 N.J. Super. 194, 201 (App. Div. 2001)). Therefore, even giving Plaintiff full credibility and every inference in her favor, she cannot meet her burden of establishing the existence of a dangerous condition. *See Celotex,* 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial.").

Plaintiff's reliance on two cases as "persuasive and applicable" is misplaced. (*See* Pl. Opp. Br. at 5 (citing *Ratering v. Mele*, 11 N.J. Super. 211 (App. Div. 1951) and *Parmenter v. Jarvis Drug Store, Inc.*, 48 N.J. Super. 507 (App. Div. 1957)). In *Ratering*, a plaintiff established that a set of steps was "littered with enumerated foreign substances" and she alleged that she slipped on one of them and fell. 11 N.J. Super. at 214. The Appellate Division found

that the plaintiff's inability to specifically pinpoint which particular foreign substance caused her to fall "would not appear to be significant." *Id.* In other words, the plaintiff in *Ratering* was able to establish that a dangerous condition existed, even if she could not precisely say which aspect of the condition caused her to fall. Similarly, in *Parmenter*, the issue there was whether the defendant had notice of the wet floor on which plaintiff slipped. 48 N.J. Super. at 510. Thus, the plaintiff had clearly identified the dangerous condition—the wet floor. Therefore, both *Ratering* and *Parmenter* are distinguishable from the facts of this case and do not relieve Plaintiff of her burden from establishing the existence of a dangerous condition. Plaintiff cannot meet that burden here, where she cannot show that a dangerous condition existed beyond her unsupported and conclusory statement that she felt "something" which caused her to fall, and where no object or substance was located.

Second, even if there was evidence in the record to support Plaintiff's claim that a dangerous condition existed which caused Plaintiff to fall, there is no evidence in the record from which a reasonable trier of fact could conclude that Defendant had notice of the condition. Plaintiff did not directly address this point in her opposition brief, and has not identified any evidence which suggests that Defendant had actual or constructive notice of the dangerous condition which could support a *prima facie* showing of negligence. *Brown*, 95 N.J. at 291 (noting that an injured plaintiff must prove that the defendant had actual or constructive knowledge of the dangerous condition that caused the accident); *see also Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 527 (D.N.J. 2013) (noting that bare allegations or speculation not enough to defeat summary judgment). In fact, the evidence shows that the area where plaintiff fell, specifically the women's department, was regularly monitored by numerous J.C. Penney associates and that every associate, from a salesperson to the store manager, was

11

trained to and had the obligation to identify potential hazards and rectify any hazard observed. (Def. SMF ¶¶ 29–35). Thus, summary judgment is also warranted on this basis because Plaintiff has failed to adduce any specific evidence which demonstrates that J.C. Penney had notice of the allegedly dangerous condition.

Furthermore, the Court disagrees with Plaintiff to the extent that she contends that issues regarding comparative negligence, (Pl. Opp. Br. at 2–3), or proximate causation, (*id.* at 3–4) are sufficient to defeat summary judgment. Because Plaintiff cannot point to evidence showing that a dangerous condition existed, let alone that J.C. Penney had notice of it, Plaintiff cannot meet her *prima facie* burden of showing that Defendant breached a duty of care, and so issues of comparative negligence or proximate causation are beside the point.

Finally, the Court notes that the potential issue of spoliation is not enough to defeat summary judgment. Plaintiff claims that "there *may* be a genuine issue of material fact as to whether [J.C.] Penney[] intentionally (i.e. willfully) withheld, altered or destroyed evidence or failed to preserve evidence helpful to Mrs. Jennings." (Pl. Opp. Br. at 1) (emphasis added). However, the evidence in the record is that no video evidence ever existed of this incident. (*See* Def. CSMF ¶ 8). Plaintiff's speculation that evidence may have been destroyed is not sufficient to defeat summary judgment when there is no evidence in the record to support such a claim.[4]

## V.   Conclusion

For these reasons, the Court GRANTS Defendants' motion for summary judgment. An accompanying Order follows this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

[4] To the extent that Plaintiff believes she has a separate claim for fraudulent concealment, the Court simply notes that this separate tort has not been pled, and Plaintiff has not sought to amend her pleadings to include it. Thus, this potential claim is irrelevant to the instant motion.